# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                                    Plaintiff,

vs.

AARON A. BOOKER,

                                    Defendant.

Case No.:  3:18-cr-02611-GPC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

**[ECF No. 27.]**

*Miranda v. Arizona*, 384 U.S. 436 (1965), established a prophylactic rule in support of the Fifth Amendment requiring investigators to inform a suspect of his right to an attorney and right to remain silent before custodial interrogation.  Unless these *Miranda* rights are waived, law enforcement officers are not allowed to interrogate the suspect about a crime.  Violations of this rule result in the suppression of statements taken in violation of *Miranda* in the Government's case in chief.  Except where the statements are involuntary, they may be used for impeachment if a defendant testifies.  *See Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) ("Although a statement, taken in violation of *Miranda*, may not be used substantively in the prosecution's case-in-chief, such a statement, if voluntary, may be used for impeachment should the Defendant testify inconsistently."); *see also Harris v. New York*, 401 U.S. 222, 224 (1971).

Defendant Aaron A. Booker ("Defendant") has moved to suppress statements made to Naval Criminal Investigative Service ("NCIS") agents on March 13, 2017, May 25, 2017 and May 26, 2017, alleging that each statement was obtained in violation of his Fifth and Sixth Amendment rights. (ECF No. 27-17 at 9.)

In its response to the motion, the Government argued that although none of the statements were custodial (and therefore, subject to *Miranda*), it would not offer, in its case-in-chief, any post-*Miranda* statements on March 13, 2017 and May 25, 2017. (ECF No. 31 at 9, ECF No. 60 at 1-2.) Instead, it reserves the right to use these two sets of statements as impeachment should Mr. Booker testify at trial. (*Id*. at 2.) With respect to the May 26, 2016 telephone call initiated by Mr. Booker to NCIS Agent Joseph Warpinski, Defendant claims that the statement was the fruit of an earlier *Miranda* violation and is tainted by high pressure tactics employed during the May 25, 2017 custodial interrogation. The Government opposes and asserts that Mr. Booker's telephone call and statements are untainted by any alleged *Miranda* violations or government conduct.

Based on the pleadings, evidence submitted at the evidentiary hearing and arguments of counsel, the motion to suppress statements is determined to be **MOOT in part,** is **GRANTED in part** and **DENIED in part**.

## I.  PROCEDURAL HISTORY

On May 23, 2018, a federal grand jury returned an indictment charging Mr. Booker with the Possession of Stolen Explosives, to wit, twenty MK3A2 grenades, also known as G911 grenades, in violation of 18 U.S.C. §§ 842(h), 844(a)(1). (ECF No. 15.)

On October 2, 2018, Mr. Booker filed the instant Motion to Suppress Statements. (ECF No. 27.) The Government filed its original response and opposition on October 19, 2018. (ECF No. 31.) An evidentiary hearing was held on January 15, 2019. Supplemental briefing was requested by the Court and has been filed by the parties. (ECF Nos. 42, 54, 60, 63, 67.)

## II. FACTUAL BACKGROUND

A. <u>Theft of 20 Grenades</u>

According to the Government, on January 20, 2016, the USS Pinckney, a U.S. Navy destroyer, received 60 MK3A2 concussion hand grenades packaged and sealed in three wooden crates with 20 grenades per crate. The grenades were stored inside of Ready Service Locker-6 ("RSL"), and secured with a heavy duty, military issued key lock accessible only to the Gunner's Mates ("GM") on duty.

On August 26, 2016, there was a full inventory of explosives onboard the USS Pinckney which accounted for all 60 grenades. On February 8, 2017, another routine inventory was conducted when it was discovered that one of the crates had a missing seal and all 20 MK3A2 grenades were missing. Since access to RSL-6 was limited, NCIS interviewed 15 sailors who had access to RSL-6 between August 26, 2016 and February 9, 2017. At the time the grenades were discovered missing, Mr. Booker, a GM, was in the process of transferring to his new command in Great Lakes, Illinois. He, reportedly, was the sole person assigned to complete temperature checks for RSL-6 on a number of days during his time on the USS Pinckney from November 2016 and January 8, 2017. Mr. Booker officially detached from the command on February 14, 2017 and on March 6, 2017, he checked into his new command in Great Lakes, Illinois.

B. March 13, 2017 Interview

On March 13, 2017, NCIS Special Agents Tom Donnelly and Warpinski contacted Mr. Booker's commanding officer at Great Lakes, Illinois to arrange for a command representative to pull Mr. Booker out of training to meet with the agents for questioning. (ECF. No. 52 at 45-46; Booker Declaration, ECF No. 42-1 at 1.) Mr. Booker understood that he was being ordered to submit to the interview. (*Id*.) The interview took place at the NCIS offices located on the second floor of the legal building, which are access controlled for entry only. (ECF. No. 52 at 45.) The main entrance door opens into a lobby area where there are three interview rooms. SA Warpinski testified that the doors to those interview rooms are unlocked. (*Id*.) Mr. Booker was interviewed in one of the interview rooms. According to SA Warpinski, Mr. Booker was free to walk out of that room and out the

main lobby door without assistance from an agent. However, Mr. Booker was never informed that he was free to go at any time.

Mr. Booker has offered a declaration from a former NCIS agent, Anthony Perrin, that asserts that when the military tells a member to report to NCIS, this directive is considered a lawful order and a refusal to report can be charged as a "minor offense" for failure to follow orders. (Perrin Declaration, ECF 42-2.) Further, Mr. Perrin declared that, while it was presented as a request, the military imposes adverse consequences on individuals who elect not to cooperate. Meanwhile, SA Warpinski testified that, in his experience, he was unaware of individuals who refused to submit to an interview being charged or punished.

The interview of Mr. Booker was recorded. (ECF No. 40, Exh. 1A.) SA Donnelly read Mr. Booker his Article 31(b) rights, the equivalent of *Miranda* warnings, which is required whenever a military member is interviewed about potential incriminating evidence regardless of the setting or circumstances.[1] After reading his rights, the agent asked if he wanted to talk to them. Mr. Booker stated, "I don't mind. . . I just don't want to get involved, that's all. Sure I will talk to you. But I can terminate at any time, right?" Mr. Booker agreed to speak with the agents without an attorney present. (Ex. 1A at 10:37-10:39.)

Approximately one hour into the interview, the agents told Mr. Booker that they had seized evidence, sent it to the lab and had it processed, and the evidence (including fingerprint and DNA evidence) implicated Mr. Booker. (*Id*. at 11:28.) The agents then informed Mr. Booker that they did not believe he was being honest and they "know you did it." (*Id*.) Mr. Booker replied, "That's why I want to stop this right now because this is

---

[1]    Mr. Booker states in his pleadings that the "Military Article 31 rights are the standard *Miranda* warnings." (ECF No. 27-1, at 4.) This equivalency finds support in caselaw. *Brosius v. Warden, U.S. Penitentiary, Lewisburg*, PA, 278 F.3d 239, 245 (3d Cir. 2002) (Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C § 831(b) "differs from *Miranda* in that it requires warnings whenever a service member is 'suspected of an offense' and is being interrogated. It may thus apply in situations in which a service member is not in 'custody'.")

kind of overbroad." When an agent asked: "You don't want to talk to us anymore?" Booker replied "no." The agents left the room and returned after 15 minutes. Agent Donnelly then made a number of accusatory statements that led Mr. Booker to briefly discuss the evidence, dangers of the grenades, and a polygraph. (*Id*. at 11:27–11:33.) Around time 11:33:40 on the video recording, Mr. Booker stated that he did not want to speak with the agents anymore.

Afterwards, the agents left the room and returned approximately 15 minutes later, explaining that they were waiting for a driver to transport Mr. Booker back to his post. For the next 24 minutes, the agents confronted Mr. Booker and pressed him to make a statement by letting Mr. Booker know that the case involved public safety, the severe consequences if someone ended up hurt by one of the grenades, and the fact that the agents were not just going to go away. Finally, the interview was concluded and the NCIS agents returned Mr. Booker to his command.

C.  Discovery of Backpack with 18 Missing Grenades

On April 20, 2017, a black backpack containing 18 MK3A2 grenades was discovered on the side of the road on Interstate 15 near mileposts 21 and 22 in northwest Arizona. The backpack with the 18 grenades was turned over to an Arizona Department of Public Safety ("AZDPS") Officer on April 20, 2017. That officer then turned the bag and grenades over to the Federal Bureau of Investigation ("FBI"). The grenades had the same lot number as the missing grenades from the USS Pinckney. The black bag was a standard military style backpack with "GM2 BOOKER" handwritten on a tag inside the bag.

D.  May 25, 2017 Interview

On May 25, 2017, Special Agents Warpinski and Bell arranged with Mr. Booker's commanding officer to speak with Mr. Booker again in Great Lakes, Illinois at the legal building. (ECF. No. 52 at 52-53.) SA Warpinski testified at the January 15, 2019 hearing that Mr. Booker was notified that he needed to report to NCIS offices and a command representative drove Mr. Booker to the legal building. (*Id*. at 54.) There, the agents met with Mr. Booker in the same NCIS office where they had previously interviewed Mr.

Booker. (*Id*.) Mr. Booker again understood that attendance at the interview had been ordered by his commanding officer. (Booker Declaration, ECF No. 42-1 at 2.)

SA Warpinski began the interview by directing Mr. Booker not to say anything and to listen for a little while. (ECF No. 54-1 at 1.) He proceeded to inform Mr. Booker, among other things, that a backpack bearing his DNA was discovered near a highway in Arizona and was found to contain 18 of the missing grenades. Agent Warpinski then explained that the agents had an entire case against Mr. Booker and that Mr. Booker had two options when it came to acceptance of responsibility: he could refuse to acknowledge responsibility or he could acknowledge what happened, who was involved and account for the last two grenades. SA Warpinski then read Mr. Booker his Article 31(b) rights, and Mr. Booker requested legal counsel.

The agents left the room at approximately 8:57 on the video recording, and when they returned nine minutes later, they informed Mr. Booker that they were preparing to execute search warrants as follows:

**9:06:38** [Agents return.]

> SA Warpinski: All right man, um, I got some questions for you that are not related to the case that are safety questions. Um, we are, we have a series of search warrants that we are about to go execute um we have one for your car, we have one for your house. Um, and I want to know, I mean there's two ways we can do these things, we can breakdown your door, which I know you don't want us to do because you don't want to pay for it. Um, if you want to tell us where your keys are, give is (sic) your keys, so we can just open your door, um same things goes for your car.
>
> A. Booker: Can I be present when you do
>
> this?
>
> SA Warpinski: Uh you can.
>
> SA Bell: We will take you with you, (sic) you are not going to be in the house or in, you can be outside the residence in the car with me or something. You are not going to be in there.
>
> A. Booker: Do you have to?
>
> SA Bell: Oh, we are doing it dude, I don't, I don't, yeah, I don't know you listened to Joe in the beginning, but this is big time.

A. Booker: Oh yeah, I see.

SA Bell: This is joint terrorism FBI stuff, right.

A. Booker: No, no, no I was willing to . . . I am still willing to cooperate
(unintelligible –
SA Bell talking over Booker).

SA Bell: So, so I hope you understand it now it's, it's gone a little bit beyond the
military right. These aren't military warrants; these are Federal search warrants.

Mr. Booker stated that he believed that the agents had engaged in good cop/bad cop and that ultimately he wanted the agents to see that there was no evidence of any crime at his home or his car. This remark prompted the following exchange:

SA Bell: I know you have never met me, but I want you to, because you never
met me, I want you to know me. I don't bullshit dude; I got no issues; I got
nothing to do with that, right. The good cop/bad cop thing is not a real thing.
What today was, you know why we came back today really right?

A. Booker: Because of the pictures and stuff.

SA Bell: No, well okay. That was part of it, we didn't have to come back today.
We did that right. Joe is completely 100% truthful with you; the evidence speaks
for itself.

A. Booker: Uh huh.

SA Bell: Today was an opportunity for you just to talk and tell us your
story.

A. Booker: Yeah.

SA Bell: So we could go back and do good work, write good reports, talk to the
right people and tell them exactly what you told us.

At this point, Mr. Booker spoke about his backpack and explained why he would not be involved with stealing the grenades. The agents responded that they could not speak with him since he invoked his right to counsel, and they could not consider anything he said without a waiver of his rights. At 9:11 in the interview, Mr. Booker stated that he wanted to talk about "my history of leaving stuff behind." At this point, he advised the agents that he is on anxiety medication and would need to take it in a half

7

hour.  The NCIS agent then reviewed Mr. Booker's Article 31(b) rights with him again and Mr. Booker waived his Article 31(b) rights and spoke to the agents. After his waiver, Mr. Booker confirmed ownership of the backpack and acknowledged he traveled along the remote section of Interstate-15 where the grenades were located. He stated the backpack was stolen from him approximately one year earlier after he left it in the armory of USS Pinckney, which upset him because it contained a GM Pin on the front that is extremely difficult to find. He stated that he had seen the grenades outside of their packing crates and received training on their use.

At the end of the interview, Mr. Booker requested to be present at the search of his vehicle and his residence. Thereafter, Mr. Booker was handcuffed and advised that he was a suspect in an investigation for the theft of 20 MK#A2 grenades.  (ECF 54-1, p. 56.) Afterwards, Mr. Booker rode with the agents to his command to pick up his keys for his residence, and then they drove to his home.

After arriving at his home, Mr. Booker was unhandcuffed throughout the execution of the search warrant at Mr. Booker's home and re-handcuffed when he was transported back to the base at the conclusion of the search at approximately 5:30 p.m. that afternoon. (ECF No. 52 at 30-31.)  During the search, the GM pin that Mr. Booker claimed was on his backpack when it was stolen was found in his residence. He acknowledged it was the same pin, and he could not provide a reason why he still had the pin if it was stolen with the backpack.  After the home search, the agents and Mr. Booker returned to the Naval Base to complete the search of his vehicle in Mr. Booker's presence. Thereafter, Mr. Booker was fingerprinted at the NCIS Offices and then given a ride to his command by a command representative.  Mr. Booker was not arrested or further detained.

B. May 26, 2017 Telephone Call

On May 26, 2017 at approximately 1:11 p.m. (PDT), shortly after returning to San Diego from Illinois, the SA Warpinski received a telephone call from Mr. Booker, who told the agent that he had called several people in San Diego about the grenades. (*Id*. at 64: ECF No. 40, Ex. A-3.)  Mr. Booker advised that NCIS should look in Tijuana,

Mexico for the last two grenades. He claimed his former motorcycle club was associated with two individuals in San Diego who had connections to the "cartel," and the grenades were stolen at the request of the cartel. He continued to deny he stole the grenades but admitted he "went into the box" to confirm the grenades were present.

## III. <u>DISCUSSION</u>

Mr. Booker has moved to suppress his March 13 and May 25, 2017 statements (the "Great Lakes interviews"), arguing that the statements were custodial, involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Meanwhile, Mr. Booker has moved to suppress the subsequent May 26th telephonic statements as fruit of illegal conduct, and tainted by high pressure tactics employed during the May 25, 2017 interrogation. (ECF No. 27-1 at 10-12.)

The Government has indicated it will not offer any March 13th statements made after Mr. Booker asked the agent to stop the interview. (ECF No. 31 at 9.) Thus, the only live question as to that interview is whether Mr. Booker's pre-invocation statements on that day are admissible. The answer turns on whether the interview was custodial, whether Mr. Booker waived his *Miranda* rights, and whether his statements were voluntary.

As to the May 25th statement, the Government advised that it does not intend to offer the statement in its case in chief but reserves the right—in the event that Mr. Booker elects to testify—to use the statements for impeachment during cross-examination. (ECF No. 60 at 1-2.) Accordingly, it is unnecessary to conduct a *Miranda* inquiry for this statement and, instead, the Court will only determine whether these statements were voluntary.

Finally, the Government opposes the factual and legal basis for the motion to suppress the May 26th telephone call statements as the fruit of illegal conduct or the tactics employed at the May 25th interview.

## A. WHETHER THE MARCH 13TH STATEMENTS WERE MADE IN CUSTODY, OBTAINED IN COMPLIANCE WITH *MIRANDA*, AND VOLUNTARY

### 1. Custody

The Government argues that *Miranda* does not apply to any statements obtained during the March 13th interview because the statements were not the result of custodial interrogation.  Mr. Booker counters that these interviews were sufficiently coercive to qualify as custodial interrogation.  The Court agrees.

"An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*)).  Whether a suspect is in custody turns on whether there is a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (quoting *Mathiason*, 429 U.S. at 495).

This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position, *see Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), and focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned, *Stansbury*, 511 U.S. at 323. The court evaluates whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun–Panez*, 812 F.2d 578, 580 (9th Cir. 1987), *modified by* 830 F.2d 127 (9th Cir. 1987). In its evaluation, the Court considers five non-exhaustive factors: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

Here, Mr. Booker was summoned on March 13, 2017 by his commanding officer to meet with the investigating agents for interviews. Mr. Booker asserts that he considered the instruction to report for interviews as an order. (Booker Declaration, ECF No. 42-1 at 1.) In addition, Mr. Booker has submitted a declaration from a former NCIS agent that asserts that when the military tells a member to report to NCIS, this directive is considered a lawful order: a refusal to report can be charged as a "minor offense" for failure to follow orders and result in adverse consequences. (Perrin Declaration, ECF No. 42-2.) SA Warpinski acknowledged the effect of being a military officer reporting for an interview when he preceded the Military Article 31 rights by explaining that "it's a little different in the military because we have to worry about command influence" "so we're going to read you your Article 31 rights." The Court finds that Mr. Booker, as a military officer, could have faced possible consequences if he elected not to meet with the NCIS agents.

In addition, Mr. Booker was placed in a NCIS closed interview room and never told he could leave whenever he wished. At no point did Mr. Booker even go to the restroom during the interview.[2] The interview lasted more than an hour and Mr. Booker was confronted with accusations regarding his role in the theft of 20 grenades.

The Government argues that Mr. Booker was not restrained because he was free to leave. In *Mathiason*, defendant was questioned in a closed room in the office of a law enforcement agency. *See* 429 U.S. at 493–94. Although taking place in an admittedly "coercive environment," the questioning, there, was found not to amount to custodial interrogation because the defendant had been told that he was not under arrest and that he was to leave, and thereafter he left without hindrance. *See id.* at 494–95.

Similar to *Mathiason*, in *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc), the Ninth Circuit observed that "[b]eing aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial." In *Crawford,* the defendant's home was subjected to a

_____

[2] On March 13, 2017, prior to being confronted with assertions that the agents knew that he had committed the crime, Mr. Booker was asked if he wished to use the restroom. (Ex. 1A at 11:18.)

parole search and, thereafter, an FBI agent asked defendant whether he, the defendant, would voluntarily travel to the FBI offices for an interview. At the FBI offices, Crawford was told that he was not under arrest and that he was free to go. The defendant was, moreover and in fact, returned home at the end of the interview, without being arrested. The Ninth Circuit concluded that Crawford's interview at the FBI offices was noncustodial because Crawford had been aware of the freedom to depart and had departed after questioning at the law enforcement office.

In this case, Mr. Booker was summoned to meet with the agents for an interview. Because of the "worry about command influence," SA Warpinski provided Mr. Booker his Article 31 rights at the beginning of the interview. Mr. Booker was not made aware that he could leave at any time and never left the interview room throughout the two interviews. During the interviews, Mr. Booker was confronted with proof of his guilt, some parts which were true and others that were not. The totality of the circumstances supports the conclusion that Mr. Booker was in custody and entitled to *Miranda* protections at the March 13, 2017 interviews.

Having concluded that Mr. Booker was in custody on March 13, 2017, he was entitled to all of *Miranda*'s protections. Any statements made by Mr. Booker prior to being read his *Miranda* rights may not be used by the Government in its case in chief; the motion to suppress is granted in part in this regard.

### 2. Admissibility of Statements made after *Miranda* warnings

What then, of the statements made by Mr. Booker *after* the NCIS agents read him Article 31(b) rights? Mr. Booker argues that the Government failed to prove that he knowingly and voluntarily waived his rights, as required by *Miranda*, such that the remainder of the interview is inadmissible for any purpose. In addition, Mr. Booker claims that a later statement to stop the interview was a clear re-invocation of *Miranda*, which the Government ignored, and which informed Mr. Booker's belief on May 25th and May 26th that the agents would simply run roughshod over any assertions of his rights.

The Government, on the other hand, asserts that Mr. Booker clearly waived his *Miranda* rights and did not make equivocal statements requiring further clarifying questions from the agents. Nonetheless, the Government has agreed that it will not introduce any post-invocation statements in its case-in-chief, (ECF No. 31, at 9), but maintains such statements may be invoked in cross-examination for impeachment purposes because they were given voluntarily under traditional due process standards. (ECF No. 60, at 2, n.1.)

The parties' contentions about waiver, invocation, and voluntariness with respect to statements made after the agents' recitation of *Miranda* rights are addressed in turn.

### a. A Knowing and Voluntary Waiver

Under *Miranda*, before the police can interrogate a person who is in custody, the person must be told that they have the right to remain silent, that anything they say can be used against them, that they have the right to the presence of an attorney, and that if they are indigent, they are entitled to an appointed attorney. 384 U.S. at 479. Mr. Booker alleges that the Government has failed to prove that he knowingly and voluntarily waived his rights because the Government repeatedly diluted the import of the warnings by engaging in deceptive conduct.

The Court finds Mr. Booker understood the March 13th warnings and that his waiver was made knowingly and voluntarily. Prior to receiving his rights, Mr. Booker was asked if he had any idea why he was asked to talk to the agents. (Ex. 1A at 10:35.) Mr. Booker replied that he heard from others that grenades were discovered missing. After he was given *Miranda* warnings, Mr. Booker was asked "Do you wanna talk to us?" Mr. Booker replied "I don't mind" but "I just don't want to get involved … sure I'll talk to you but I can terminate at any time, right?" to which the agents told him that he can terminate. (*Id.* at 10:37.) After signing the *Miranda* waiver form, Mr. Booker stated that "I want to help but I don't want to get anyone in trouble." (*Id*. at 10:39.)

The record reveals that Mr. Booker understood his rights, including his right to terminate the interview, and that his primary concern was not getting others in trouble. His

3:18-cr-02611-GPC

understanding is further evidenced by his invocation of his rights after the agents informed him that they knew that Mr. Booker "did it" and knew where the grenades were. Further, Mr. Booker's statements that he "don't want to get involved," an ambiguous invocation; viewed in context of his willingness to talk with the agents, and his statements that he "wanted to help," the Court does not find that there was an equivocal assertion of rights triggering the duty of the agents to cease all questions but those aimed at clarifying the ambiguity. *United States v. Rodriguez*, 518 F.3d 1072, 1077–78 (9th Cir. 2008). None of Mr. Booker's statements would have led a reasonable police officer to understand that Mr. Booker was invoking his right to silence or requesting an attorney.

Mr. Booker knowingly and intelligently waived his *Miranda* rights on March 13, 2017.

### b. The Invocation of *Miranda* Rights and Re-initiation of Interrogation

The next question—whether *Miranda* was violated as a result of the agents overcoming Mr. Booker's subsequent invocation—is moot given the government's agreement not to introduce any post-invocation statements in its case in chief. However, the Court engages in the analysis because Mr. Booker cites the agents' post-invocation conduct as being part of a pattern of ignoring his *Miranda* rights which ultimately affected his perception of the agents during his May 25, 2017 interview, and his decision to call SA Warpinski on May 26, 2017.

Law enforcement must immediately cease interrogating a suspect if, "in any manner, at any time prior to or during questioning," the suspect invokes the right to remain silent or the right to an attorney. *Miranda*, 384 U.S. at 473–74. As established *supra*, Mr. Booker initially waived his rights after being given his *Miranda* rights. However, after being accused of being involved in the theft, he invoked his *Miranda* rights stating "I wanna stop this interview right now cause . . . ." In response, one of the interviewing agents continued: "you don't want to help yourself out?" In spite of the invocation, the agents continued to confront Mr. Booker, which eventually led Mr. Booker to make additional statements. (Ex.

1A at 11:31-1112:14.) The sequence of events appears to present a *Miranda* violation as to Mr. Booker's post-invocation statements, but because the government has agreed not to use any such statements in its case in chief, the Court will not reach the issue.

### c. Whether the post-invocation March 13, 2017 Statements Were Voluntary

The final issue is whether, notwithstanding any potential non-compliance with *Miranda*, the post-invocation statements at issue were obtained in satisfaction of Due Process. A defendant's voluntary statements—even if obtained in violation of *Miranda*—are admissible as impeachment evidence. *See Oregon v. Elstad*, 470 U.S. 298, 307, (1985) ("[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted. Despite the fact that patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination."). "Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, the primary criterion of admissibility remains the 'old' due process voluntariness test. *Id.* at 307–09 (citation, internal quotation marks, and brackets omitted).

The Court assesses the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

Additionally relevant is Section 3501(b) of 18 U.S.C., which provides five factors courts must review to determine whether a statement is voluntarily made. These factors include: (1) the time elapsing between arrest and arraignment of the defendant; (2) whether the defendant knew the nature of the offense with which she was charged at the time of

making the confession; (3) whether the defendant was aware that he was not required to make any statement and that any such statement could be used against him; (4) whether the defendant had been advised of his right to counsel; and (5) whether counsel was present at the time of defendant's confession. 18 U.S.C. § 3501(b); *United States v. Shi*, 525 F.3d 709, 730 (9th Cir.2008). No one factor is necessarily conclusive on the issue of the voluntariness of a confession. *Id.*

At the time of his interview on March 13th, Mr. Booker was not under arrest, he was aware of the nature of the offense with which he was being investigated, was provided his *Miranda* rights and knew he was not required to make any statement and that any statement could be used against him. Mr. Booker does not point to police deception that prompted any of his statements. Nor are there facts offered relating to Mr. Booker's mental condition that would have rendered any statements involuntary. The facts supporting Mr. Booker's position are that he was in custody, counsel was not present and that the agents continued to confront Mr. Booker for approximately 20 minutes after he invoked his *Miranda* rights. The Court finds that the totality of the circumstances demonstrate that Mr. Booker's post invocation statements on March 13th are trustworthy, voluntary and may be used to cross-exam Mr. Booker as impeachment.

## B. WHETHER THE MAY 25TH STATEMENTS VIOLATED *EDWARDS/MIRANDA*, OR DUE PROCESS VOLUNTARINESS REQUIREMENTS

The Court next turns to the admissibility of the May 25, 2017 statements. Like the March 13, 2017 interview, the May 25, 2017 interview—conducted under similar circumstances at the same NCIS office building in Great Lakes, Illinois—was custodial in nature.

### 1. Mr. Booker's *Edwards/Miranda* claim is moot

It is undisputed that Mr. Booker invoked his right to counsel during the May 25th interview. According to the Supreme Court, where, as here, a defendant invokes the right to counsel during a custodial interview, *Miranda* requires that the suspect is not subject to

further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication*, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 484, 485 (1981).

Mr. Booker argues that *Edwards* and *Miranda* prohibit the introduction of his May 25, 2017 statements because he was subjected to questioning despite having never re-initiated any communications with the agents after the initial invocation. The Government disagrees with this characterization—insisting Mr. Booker reinitiated an exchange—but has nonetheless agreed not to offer any of the May 25, 2017 statements in its case in chief.

In light of the Government's position, Court sees no need to reach the *Edwards/Miranda* issue. The Government's agreement renders Mr. Booker's *Edwards/Miranda* claim moot, since the strongest remedy for a *Miranda*-based violation is exclusion of the offending statements from the prosecution's case in chief. As a result, it is unnecessary to determine whether Mr. Booker reinitiated further communication with the agents.

### 2. Voluntariness of the May 25th Statement under Traditional Due Process Principles

This brings the Court to whether the May 25th statements were voluntary. The implications of this inquiry are two-fold: if determined to be voluntary, the statements will be admissible as impeachment on cross-examination; if they are not, the circumstances of their procurement will bolster Mr. Booker's claim that his May 26th statements were tainted by his May 25th statements.

To repeat the applicable legal standard: a defendant's statements—even if obtained in violation of *Miranda*—are admissible on cross examination of a defendant as impeachment evidence if they are voluntary. *Harris*, 401 U.S. at 224 (1971) ("It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."); *see also United States v. Gomez*, 725 F.3d 1121 (9th Cir. 2013). Caselaw recognizes the limitation on the government's ability to impeach a

defendant with prior inconsistent statements taken in violation of *Miranda* which requires that the statement must have been voluntary. *United States v. Makhlouta*, 790 F.2d 1400, 1404 (9th Cir.1986).

The Court assesses the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Elstad*, 470 U.S. at 318.

Mr. Booker argues that his May 25th statements were involuntary. He claims the agents engaged in high pressure, deceptive tactics and that he was psychologically vulnerable due to his anxiety and depression. (ECF No. 69 at 2.) The conduct relied upon consists of the agents' words and actions: (1) conveying sympathy, (2) engaging in deceptive conduct, (3) using high pressure tactics, (4) playing on Mr. Booker's emotions, (5) exploiting his psychological condition, and (6) ignoring his invocation of *Miranda* rights during the March 13th interview.

### a. Conveying Sympathy

The May 25th interview began with SA Warpinski conveying sympathy for Mr. Booker's problems on the USS Pinckney and being charged with speeding and evading arrest. (ECF No. 54-1 at 2.) He described the charges as "bullshit" and accused leadership on the USS Pinckney of creating a "toxic situation" and making a mess of the weapons department. (*Id.*)

The conduct is unremarkable alone or in concert with the other conduct.

### b. Deceptive Police Conduct

In their presentation before *Miranda* warnings were administered, the agents truthfully revealed evidence that connected Mr. Booker to the stolen grenades. This evidence consisted of the following: that Mr. Booker had access to the 20 stolen

3:18-cr-02611-GPC

grenades while stationed on the USS Pinckney; that 18 of the missing grenades were discovered in a backpack with Mr. Booker's name written inside; and that the backpack was discovered adjacent to the route that Mr. Booker took on the way from San Diego to Great Lakes, Illinois. In addition, the agents engaged in deceptive conduct by falsely reporting that Mr. Booker's DNA and fingerprints were found on the grenades and bag in which the grenades were discovered. The agents also falsely claimed that cell tower data placed Mr. Booker in the area where the bag was found. *Id*. at 4. Later, Agent Bell asked Booker what if he "were to show you a video okay of your car on the side of the road on (sic) Arizona dropping off that bag would you be shocked?" *Id*. at 37. Afterwards, Agent Bell describes the video as capturing "somebody who looks like you, somebody who drives the same car as you, somebody who had the same license plate as you…" *Id*. at 39.

Interrogation of a suspect will necessarily involve some pressure because its purpose is to elicit a confession. In fact, interrogators commonly use a laundry list of tactics in order to obtain incriminating statements. *See Richard A. Leo, Inside the Interrogation Room*, 86 J.Crim. L. & Criminology 266, 278 (1996). Cases analyzing police deception universally observe that deception alone does not render a confession involuntary. *See Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969). "[A]s long as th[e] decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993) (citation omitted); *see also*, *Ortiz v. Uribe*, 671 F.3d 863 (9th Cir. 2011); *United States v. Haak*, 884 F.3d 400 (2d Cir. 2018) (a finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not necessarily render the confession involuntary).

The law permits the police to pressure and cajole, conceal material facts, and actively mislead interviewees. *United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir.1990). A confession must be excluded only "if the government feeds the defendant false information that seriously distorts his choice, [for example] by promising him that if

he confesses he will be set free"—in other words, only if "the false statement destroyed the information that he required for a rational choice." *Id.* at 1129–30. Lies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances. *Frazier v. Cupp,* 394 U.S. 731, 739 (1969). Ultimately, "[w]hile a lie told to the detainee about an important aspect of the case may affect the voluntariness of the confession, the effect of the lie must be analyzed in the context of all the circumstances of the interrogation." *Miller,* 796 F.2d at 607.

Here, the agents made false claims regarding the existence of DNA, fingerprint and video evidence. The false claims were mixed in with evidence that connected Mr. Booker to the stolen grenades which included Mr. Booker's access to the 20 stolen grenades, the discovery of 18 of the missing grenades in a backpack with Mr. Booker's name written inside; and the discovery of the backpack in an area adjacent to the route that Booker took on the way from San Diego to Great Lakes, Illinois. Given the existence of evidence which connected Mr. Booker to the stolen grenades, the false statements regarding DNA and fingerprints did not significantly distort the information that Mr. Booker required for a rational choice. Mr. Booker's decision to provide an explanation for the discovery of the grenades in his backpack appears to have been a calculated attempt to provide an innocent explanation for its discovery and evidences the rational balancing of competing considerations.

While the false statements provided were in many ways unnecessary to impress upon Mr. Booker that there was substantial evidence connecting him to the theft of the grenades, the Court cannot conclude that the deceptive statements coerced his May 25, 2017 statements.

### c. **High Pressure Tactics**

During the interview, the agents relied on tactics that are described as "high pressure" to obtain incriminating statements. The agents described the area where the grenades were found as "Sovereign Citizen Land" and reported that that the case was being looked at by the FBI as a "domestic terrorism situation." (*Id*. at 5.) The agent case

warned Mr. Booker, "every single time there's an explosion in the United States do you know the first person they are going to talk to… [] Booker." (ECF No. 54-1 at 45.) Agent Warpinski offered that "it doesn't make sense for a black kid from Chicago to be dealing with these militia groups who are mostly white supremacists." *Id.* at 34.

Throughout the interview, the agents described how this was the last chance for Mr. Booker to give his story (*Id.* at 45, 49, 55, 56) and that "we are the best option you got right now." (*Id.* at 52.) The agents described the strength of their case by stating that "we have the entire case that we need" and "when it gets to sentencing and we got enough" (*Id.* at 4-5) and that acceptance of responsibility is "a huge thing when it comes to Federal cases. When it comes to sentencing considerations…" [3] (*Id.*)

While the agents' statements at times bordered on hyperbolic, they truthfully revealed that the case was made more serious because there were two missing grenades and that the grenades that were discovered were found in an area known for domestic terrorist organizations. Given the danger that these missing grenades posed, it was not misleading or improper for the agents to identify the risks that the grenades created. To be fully informed as to the possible consequences and liability that he faced, it was appropriate to provide Mr. Booker with this additional information. Additionally, informing Mr. Booker of the significance of acceptance of responsibility does render a confession involuntary. *See*, *United States v. McVicker*, 979 F. Supp. 2d 1154 (D. Or. 2013) (Police deception alone does not render a confession involuntary, nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer).

### d. **Emotional Ploys**

Next, the evidence shows that the agents employed guilt and emotional pitches by

---

[3]    *Com. v. Scoggins*, 439 Mass. 571, 576 (2003) (statement involuntary where police first deceptively gave suspect impression that conviction was a certainty and subsequently led him to believe that a confession would help his defense or reduce his sentence).

directing Mr. Booker to think about the two missing grenades and the recent explosions at the Ariana Grande concert. The agents told Booker that he should think about a situation where a gangbanger breaks into his apartment, steals the grenades and "this thing goes off", or if Ariana Grande came into town and "an explosion goes off." (ECF No. 54-1 at 46.)

Later, Agent Warpinski instructed Mr. Booker to think about his grandfather who had been a Ranger and what he would expect of him (*id*. at 52), and to think about all those other people that served in your family. Booker was warned about "all these people that are going to find out that Aaron refused to accept responsibility for this case," (*id*. at 53) and that Mr. Booker had one last chance before we "talk to your dad." (*Id*. at 45.)

Statements appealing for Mr. Booker to protect the public against the grenades and using a family's honor are insufficient to overcome his free will. *United States v. Boslau*, 632 F.3d 422 (8th Cir. 2011) (eliciting a confession through variety of tactics, including claiming not to believe suspect's explanations, making false promises, playing on suspect's emotions, using his respect for his family against him, deceiving suspect, conveying sympathy, and even using raised voices, does not render confession involuntary, for purposes of *Miranda* analysis, unless overall impact of interrogation caused defendant's will to be overborne).

Certainly, the agent's statements tried to reach Mr. Booker through his conscience. The comments regarding misuse of the grenades was clearly based upon the safety concerns that was one of the driving forces of the investigation. Isolated statements regarding Mr. Booker's family do not rise to the level of making Mr. Booker's statements involuntary.

**e. Psychological Condition**

Mr. Booker has also raised the effect of his anxiety and depression and that he had last taken his medication around 22 hours before his interview. At time 9:11 in the interview, Booker informs the agents that he takes a time released daily dosage of medication for anxiety and explains that the meeting with the agents was "nerve

wracking" and that his nervousness was more pronounced "this time of day." (*Id*. at 10-11.) By time 10:03:20, Booker asked the agents to stop the interview (*id*. at 41), the medication arrived at 10:26 (*id*. at 43) and the interview was concluded at 10:50. (*Id*. at 57.)

In cases involving psychological coercion, the pivotal question is whether the defendant's will was "overborne." *Ortiz*, 671 F.3d at 869. "[C]oercive police activity is a necessary predicate to the finding that a confession is" involuntary. *Connelly*, 479 U.S. at 167. The interrogation techniques of the officer must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Ortiz*, 671 F.3d at 869 (*citing Moran v. Burbine*, 475 U.S. 412, 433–34 (1986)).

Here, Mr. Booker has shown that he suffers from anxiety and takes a daily dose of medications. This factor is certainly relevant in determining whether his statement was voluntary. The record shows that Mr. Booker revealed early in the interview that he took anxiety medication once a day and was scheduled to take his next dose within an hour and a half. (ECF 54-1 at 10.) Mr. Booker's anxiety did not affect Mr. Booker's exercise of his *Miranda* rights prior to being questioned. Notably, a review of the video recording of the interview does not reveal that Mr. Booker succumbed to extreme psychological pressure arising from his psychological condition or requiring medication.

### f. **Totality of Circumstances**

Here, investigating agents relied upon the full range of available interrogation techniques to have Mr. Booker confess, cooperate or make incriminating statements. As is the case in many interviews, the agents began with a friendly good cop strategy which failed to meet the goals of the interviewers. The agents then turned to a "I don't believe you mode" and a "we have the evidence" claim that did not impress Mr. Booker either. The agents then relied on false claims to beef up the strength of their case and resorted to guilt trips to lead Mr. Booker to cooperate. With respect to the voluntariness of these statements, the Court has addressed each of the techniques employed and concluded that

individually they did not overcome Mr. Booker's free will and produce involuntary statements. Considering all of the tactics together, the evidence connecting Mr. Booker to the theft and the content of his statements, the Court concludes that the statements were the product of Mr. Booker's own balancing of competing considerations rather than forces which overcame his ability to exercise his free will.

Based upon its review of the totality of the circumstances which include the entire course of police conduct and characteristics of Mr. Booker, the Court concludes that the May 25th statements are voluntary. The Government may use these statements in the cross examination of Mr. Booker if he chooses to testify.

## C. WHETHER THE MAY 26TH TELEPHONE CALL STATEMENTS ARE FRUITS OF *MIRANDA* VIOLATIONS OR COERCIVE CONDUCT

Booker argues that his May 26th statements in his telephone call to Agent Warpinski are the fruit of the *Miranda* violations the day before and, otherwise, tainted by high pressure tactics employed during the second interview. The government responds that the May 25th interrogation had no coercive effect on the May 26th statement.

The Court finds that the May 26th statement was noncustodial, was not prompted by any reinterrogation and was otherwise voluntary and is admissible. The Court analyzes the Defendant's contentions under *Miranda/Edwards*, Fifth Amendment and the Fruit of the Poisonous Tree doctrine.

### 1. The Statements Were Noncustodial

The statements made by Mr. Booker in his telephone conversation with SA Warpinski were the result of Mr. Booker calling the agent on his cell phone on May 26, 2017 at approximately 1 p.m. (PST). Mr. Booker was free in Illinois and the agent was in San Diego. Since Mr. Booker was not in custody, *Miranda* warnings were unnecessary.

### 2. *Edwards/Miranda* does not apply outside of custody; Mr. Booker, not any of the agents, re-initiated communications

Relying on *Edwards*, Mr. Booker argues that in order to overcome the presumption that any post-invocation is involuntary, the Government is required to prove that (1) defendant initiated the conversation; and (2) defendant was re-advised of, and knowingly waived, his Miranda rights prior to the May 26th statements. (ECF No. 67 at 1.) It is undisputed that Mr. Booker called SA Warpinsky and Mr. Booker was not readvised of his *Miranda* rights at any time during the May 26th telephone call. However, as observed above, Mr. Booker was not in custody at the time that he contacted SA Warpinski and *Miranda* would not apply to the telephone conversation. Similarly, the second element relating to the *Edwards* presumption would have no application either. Mr. Booker's contact with the agent on May 26th was wholly triggered by the efforts and words of Mr. Booker and the *Edwards* presumption does not apply.

Mr. Booker also argues that the conduct of SA Warpinsky was improper because once a defendant is released from custody, the police may only re-initiate questioning after fourteen days. *Maryland v. Shatzer*, 559 U.S. 98, 99 (2010) (holding that if the defendant invokes his right to counsel and is later released from custody, the police must wait at least fourteen days prior to contacting the defendant and interrogating him). In this case, 24 hours had passed between the initial May 25th interrogation and the phone call on May 26th. However, it was Mr. Booker who contacted Agent Warpinski in order to report the information that he had developed; it was he who reopened the dialogue with the authorities. Agent Warpinski did not ask Mr. Booker to call him, make statements that suggested that Mr. Booker should call him, or provide him with his phone number. If anything, the agents had repeatedly told Mr. Booker the day before that the interview on May 25th was the final opportunity that Mr. Booker had to accept responsibility. As a result, *Maryland v. Shatzer* has no application to facts of the May 26th telephone call. *Cf.* *Edwards*, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.") Nothing in *Edwards* required SA Warpinsky to avoid Mr. Booker's call; rather, the agent was entitled

to allow Mr. Booker to report the information he had developed regarding the whereabouts of the two missing grenades.

### 3. The Fruit of the Poisonous Tree Doctrine Does not Aid Mr. Booker

Mr. Booker argues that the May 26th statements should be excluded as the fruit of repeated *Miranda* violations from the May 25th interview.  He also contends that coercive interview techniques from the previous day rendered his May 26th statements involuntary and unreliable.  (ECF No. 67 at 2.)

The "fruit of the poisonous tree" doctrine is most often associated with violations of the Fourth Amendment's prohibition of unreasonable searches and seizures. *See Wong Sun v. United States*, 371 U.S. 471 (1963). It prohibits at trial the use of evidence obtained directly or indirectly through an unlawful search or seizure. *Id*. at 484. In that context, the exclusionary rule is necessary to "make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person." *Id*.

*Miranda's* exclusionary rule, however, serves the Fifth Amendment rather than the Fourth.  *Elstad*, 470 U.S. at 305–06. The Fifth Amendment's Self–Incrimination Clause bars the prosecution from using compelled testimony in its case-in-chief and is therefore primarily concerned with conduct at trial.  *Id*. at 306–07.  A police officer's failure to administer *Miranda* warnings prior to a custodial interrogation "creates a presumption of compulsion." *Id.*

Notwithstanding the fact that the doctrine sprouted from another branch of the constitutional tree, Mr. Booker relies on *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982) to support its argument that the fruit of the poisonous tree analysis applies in the context of *Miranda* violations.  In *Lee*, the court held that "[t]he circumstances surrounding a prior illegal confession may in some cases carry over and taint a subsequent confession, thereby rendering it inadmissible, even if the accused has been advised of his *Miranda* rights prior to the second confession." *Id*. at 468 (9th Cir. 1982) (citing *United States v. Toral*, 536 F.2d893, 896 (9th Cir.1976)).  The Ninth Circuit suppressed a confession as the fruit of the poisonous tree when it followed a statement made in violation of *Miranda* one day earlier.

The court found that the second confession was not sufficiently attenuated from the illegal interrogation of the previous day.[4]

Unfortunately, Mr. Booker's reliance on *Lee* is unavailing. After *Lee* was decided in 1982 by the Ninth Circuit, the U.S. Supreme Court has provided guidance regarding the consequences for a *Miranda* violation. The *Elstad* court observed that unlike evidence obtained through a Fourth Amendment violation, the *Miranda* presumption does not require that the "fruits [of unlawfully obtained confessions] be discarded as inherently tainted." *Elstad,* 470 U.S. at 307.[5] *Elstad* recognized that a "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion" and "[c]onsequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Elstad*, 470 U.S. at 307. However, the *Elstad* court went on to examine "'how sweeping the judicially imposed consequences' of a failure to administer *Miranda* warnings should be," *Elstad*, 470 U.S. at 308 (quoting *Michigan v. Tucker*, 417 U.S. 433, 445 (1974)), and concluded:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period . . . . [T]he admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

---

[4] Even if the Court applied the fruit of the poisonous tree doctrine here, the facts show that the causal chain between the May 25th statements and May 26th telephone call had been severed and the May 26th call was sufficiently an act of free will to purge the primary taint. *See Brown v. Illinois*, 422 U.S. 590 (1975).

[5] In fact, the Supreme Court has rejected automatic application of the "fruits" doctrine to violations of the *Miranda* rule on several occasions. *See Missouri v. Seibert,* 542 U.S. 600, 619 (2004) (Kennedy, J., concurring) (stating that "the scope of the *Miranda* suppression remedy depends on a consideration" of whether the central concerns of *Miranda* are implicated as well as the objectives of the criminal justice system); *United States v. Patane*, 542 U.S. 630 (2004) (the prosecution may still introduce physical evidence seized as a result of a *Miranda* violation).

*Elstad*, 470 U.S. at 309 (emphasis added).  Thus, under *Elstad*, "[t]he fruit of the poisonous tree doctrine operates in the Fifth Amendment context as follows: if the defendant's pre-*Miranda* statement was coerced in violation of the Fifth Amendment, then the court must suppress the defendant's post-*Miranda* statement unless the post-*Miranda* statement was sufficiently attenuated from the coercion to remove any 'taint.' If, on the other hand, the prior statement was voluntary in the sense that it was not coerced in violation of the [F]ifth [A]mendment, though obtained in technical violation of the *Miranda* requirements, the court should suppress the statement given after the *Miranda* warning only if the court finds that the subsequent statement was not voluntarily made." *Trethewey v. Farmon*, 39 F. App'x 591, 594 (9th Cir. 2002) (unpublished) (quoting *United States v. Wauneka*, 770 F.2d 1434, 1440 (9th Cir. 1985)).

*Elstad* teaches that a *Miranda* violation on one day—without more—does not transform an otherwise voluntary and informed waiver on the next into the fruit of a poisonous tree, unless both statements violated the Fifth Amendment right to due process. The Court determined *supra* that the May 25th statements did not violate due process voluntariness principles.[6]  As such, even if the Court were to assume arguendo that the May 25th interview was marred by *Edwards/Miranda* violations, any such violations would not require the suppression of the May 26th interview unless the May 26th statements were themselves involuntary.

Here the facts show that Mr. Booker called SA Warpinski on his own without direction or prompting by SA Warpinski.  Mr. Booker was not in custody and was not confronted with evidence of guilt.  He was free of any restraints and did not require any medication to address his anxiety and depression.  The call occurred the day following the

---

[6]  To the extent Mr. Booker has articulated a separate claim that coercive interview techniques from the previous day rendered his May 26th statements involuntary and unreliable, the Court has held *supra* that the May 25th interview passes muster under traditional due process principles.  Since the May 25th interview did not overcome Mr. Booker's free will and render his May 25th statements involuntary or unreliable, any illegality associated with the May 25th statements did not taint the May 26th statement.

28

conclusion of the interview. In the interim, Booker had time to discuss the matter with an attorney, his family or his friends. Mr. Booker was also aware of his rights as a result of being apprised of his *Miranda* rights on three separate occasions. Mr. Booker was a mature adult male with military training.

Mr. Booker's actions in calling SA Warpinsky with information that he had developed from his sources are ones that recognized the state of the investigation which exposed him to criminal liability and created a means to redirect the agents in their investigation. There is no indication that Mr. Booker's telephone call was the product of coercion rather than a rational and considered effort to avoid prosecution.

The Court also rejects Mr. Booker's suggestion that the May 26th statements were involuntary under *United States v. Bayer*, 331 U.S. 532, 540–41 (1947). In *Bayer* the Supreme Court recognized:

> [A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession may always be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. (emphasis added).

The Supreme Court applied *Bayer*'s cat out of the bag analysis in *Elstad*. In *Elstad,* the suspect made his first incriminating statement voluntarily, but without first being given the requisite Miranda warnings. One hour later, he was advised of and waived his Miranda rights and executed a written confession. The Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad,* 470 U.S. at 318.

While the Court recognized that having let the cat out of the bag may create a subtle form of lingering psychological compulsion, the Court concluded that "there is no

warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Elstad*, 470 U.S. at 318 (emphasis added) (footnote omitted). Instead, the voluntariness of any subsequent statement depends upon an evaluation of the "entire course of police conduct" and the "surrounding circumstances," *Elstad*, 470 U.S. at 318, including consideration of whether the conditions that made the first statement inadmissible have been removed. *Bayer*, 331 U.S. at 541.

Under 18 U.S.C. § 3501, the totality of the circumstances establish that the conditions that made his May 25th statement inadmissible had been removed by May 26th and that Mr. Booker's telephone call was voluntary.

## CONCLUSION

Based on the above, the Court **DENIES in PART and GRANTS in PART** Mr. Booker's motion to suppress statements.

**IT IS SO ORDERED**.

Dated: June 28, 2019

Hon. Gonzalo P. Curiel
United States District Judge

3:18-cr-02611-GPC