1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

AARON A. BOOKER,

Defendant.

Case No.:  3:18-cr-02611-GPC

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

**[ECF No. 71.]**

Defendant Aaron A. Booker ("Defendant") has moved to suppress the passcode to his iPhone 6 Plus, which was recorded by a Naval Criminal Investigative Service ("NCIS") agent during an interview on May 25, 2017, as well as any results of the subsequent searches of the iPhone 6 Plus using that passcode.  ECF No. 71-1 at 3–4. Defendant alleges that the passcode was obtained in violation of his Fourth, Fifth, and Sixth Amendment rights as well as *Miranda*.  *Id.* at 4.  The Government opposes.  ECF No. 73.

Based on the pleadings, evidence submitted at the evidentiary hearing and arguments of counsel, the Court **GRANTS** the motion to suppress.

\ \ \

\ \ \

## I.   PROCEDURAL HISTORY

On May 23, 2018, a federal grand jury returned an indictment charging Mr. Booker with the Possession of Stolen Explosives, to wit, twenty MK3A2 grenades, also known as G911 grenades, in violation of 18 U.S.C. §§ 842(h), 844(a)(1).  ECF No. 15.

On May 24, 2019, Mr. Booker filed the instant Motion to Suppress Statements. ECF No. 71.  The Government filed its original response in opposition on June 10, 2019, ECF No. 73, and a supplemental response on August 28, 2019, ECF No. 86.  Mr. Booker filed a reply on January 8, 2020.  ECF No. 100.  On January 10, 2020, the Government filed an amended declaration supporting its response in opposition.  ECF No. 101.  An evidentiary hearing was held on January 16, 2020.  ECF No. 103.  On January 30, 2020, Mr. Booker filed a supplemental expert declaration supporting the motion.  ECF No. 109.

## II. FACTUAL BACKGROUND

The factual background of Mr. Booker's multiple interactions with NCIS agents has been recited at length in previous orders.  The Court will therefore focus on the May 25, 2017 interview, at which NCIS agents obtained the passcode for Mr. Booker's iPhone 6 Plus.

On May 25, 2017, Special Agents Warpinski and Bell arranged with Mr. Booker's commanding officer to speak with Mr. Booker in Great Lakes, Illinois at the legal building, the same location where Mr. Booker had first been interviewed on March 13, 2017.  ECF. No. 52 at 52–53.  SA Warpinski testified at the January 16, 2019 hearing that Mr. Booker was notified that he needed to report to NCIS offices and a command representative drove Mr. Booker to the legal building.  *Id*. at 53–54.  There, the agents met with Mr. Booker in the same NCIS office where they had previously interviewed Mr. Booker.  *Id*.  Mr. Booker understood that attendance at the interview had been ordered by his commanding officer.  Booker Declaration, ECF No. 42-1 at 2.

SA Warpinski began the interview by directing Mr. Booker not to say anything and to listen for a little while.  ECF No. 54-1 at 1.  He proceeded to inform Mr. Booker, among other things, that a backpack bearing his DNA was discovered near a highway in

Arizona and was found to contain 18 of the missing grenades. *Id.* at 4. SA Warpinski then explained that the agents had an entire case against Mr. Booker and that Mr. Booker had two options when it came to acceptance of responsibility: he could refuse to acknowledge responsibility or he could acknowledge what happened, who was involved and account for the last two grenades. *Id.* at 4–5. SA Warpinski then read Mr. Booker his Article 31(b) rights, and Mr. Booker requested legal counsel. *Id.* at 5–6.

The agents left the room at approximately 8:57 on the video recording, and when they returned nine minutes later, they informed Mr. Booker that they were preparing to execute search warrants as follows:

**9:06:38** [Agents return.]

> SA Warpinski: All right man, um, I got some questions for you that are not related to the case that are safety questions. Um, we are, we have a series of search warrants that we are about to go execute um we have one for your car, we have one for your house. Um, and I want to know, I mean there's two ways we can do these things, we can breakdown your door, which I know you don't want us to do because you don't want to pay for it. Um, if you want to tell us where your keys are, give is (sic) your keys, so we can just open your door, um same things goes for your car.

> A. Booker: Can I be present when you do this?

> SA Warpinski: Uh you can.

> SA Bell: We will take you with you, (sic) you are not going to be in the house or in, you can be outside the residence in the car with me or something. You are not going to be in there.

> A. Booker: Do you have to?

> SA Bell: Oh, we are doing it dude, I don't, I don't, yeah, I don't know you listened to Joe in the beginning, but this is big time.

> A. Booker: Oh yeah, I see.

> SA Bell: This is joint terrorism FBI stuff, right.

> A. Booker: No, no, no I was willing to . . . I am still willing to cooperate (unintelligible –SA Bell talking over Booker).

> SA Bell: So, so I hope you understand it now it's, it's gone a little bit beyond the military right. These aren't military warrants; these are Federal search warrants.

*Id.* at 7.  Mr. Booker stated that he believed that the agents had engaged in good cop/bad cop and that ultimately he wanted the agents to see that there was no evidence of any crime at his home or his car. This remark prompted the following exchange:

> SA Bell: I know you have never met me, but I want you to, because you never met me, I want you to know me. I don't bullshit dude; I got no issues; I got nothing to do with that, right. The good cop/bad cop thing is not a real thing. What today was, you know why we came back today really right?
>
> A. Booker: Because of the pictures and stuff.
>
> SA Bell: No, well okay.  That was part of it, we didn't have to come back today. We did that right. Joe is completely 100% truthful with you; the evidence speaks for itself.
>
> A. Booker: Uh huh.
>
> SA Bell: Today was an opportunity for you just to talk and tell us your story.
>
> A. Booker: Yeah.
>
> SA Bell: So we could go back and do good work, write good reports, talk to the right people and tell them exactly what you told us.

*Id.* at 7–8. At this point, Mr. Booker spoke about his backpack and explained why he would not be involved with stealing the grenades.  *Id.* at 8–9.  The agents responded that they could not speak with him since he invoked his right to counsel, and they could not consider anything he said without a waiver of his rights.  At 9:11 in the interview, Mr. Booker stated that he wanted to talk about "my history of leaving stuff behind."  *Id.* at 10. At this point, he advised the agents that he is on anxiety medication and would need to take it in a half hour.  *Id.*  The NCIS agent then reviewed Mr. Booker's Article 31(b) rights with him again and Mr. Booker signed a waiver of his Article 31(b) rights and spoke to the agents.  *Id.* at 11–12.

After his waiver, SA Bell brought up Mr. Booker's need to obtain his anxiety medication, and Mr. Booker said he needed to take the medication no later than 10:30 a.m., or within approximately an hour and a half.  *Id.* at 12.  The agents proceeded to question Mr. Booker about a number of topics, including his backpack, his drive from

San Diego to Illinois, and the grenades.  The agents then emphasized to Mr. Booker that the evidence against him was strong and that others had named him and told Mr. Booker that if he doesn't tell them the whole story, he would be in a tough spot.  *Id.* at 32–33.  At approximately 9:15 in the recording, Mr. Booker said "Like I get that this is damning evidence, great.  That's why I was like no, I need a lawyer because I don't know what the fucks going on." *Id.* at 33.  SA Warpinski then proceeded to discuss the fact that two grenades had not yet been found and indicated that the FBI sought to take the case due to the fact that the other grenades were found in "domestic terrorism land." *Id.* at 34.  After Mr. Booker said he had no more to tell, SA Warpinski then asked if the agents could look at his phone, and Mr. Booker refused and asked if they could get his medication soon. *Id.* at 35–36.  SA Bell responded "Yeah, we, we will get it to you. We will probably have to have somebody run it over to you. We won't leave you out to dry," but continued the interview, informing Mr. Booker that they had a video recording of someone in what appears to be his car dropping off the backpack on Interstate 15. *Id.* at 36–39.

Shortly after 10:00:00 on the recording, in response to a question about the purported video, Mr. Booker said "now I know I need my medication and I don't, I don't want to do this anymore man." *Id.* at 39.  The agents then asked Mr. Booker how they could get his medication, and Mr. Booker said it was in his unlocked locker. *Id.* at 40.  The agents asked Mr. Booker who in his command they could call to retrieve the medication from his locker, and then gave Mr. Booker his iPhone 6 Plus, ostensibly to obtain the phone number, placing it on the table in front of him.  After SA Warpinski turned on the phone, Mr. Booker picked up the phone.  Within one or two seconds, SA Warpinski told Mr. Booker "You gotta keep it on the table, man I gotta be able to see what's going on." *Id.*  Mr. Booker then put the phone on the table and entered the passcode to unlock it.  At approximately 10:01 on the video recording, SA Warpinski is seen watching Mr. Booker as he enters the passcode and then writing something down in his notebook.  Mr. Booker then used the phone to call someone in his command to ask them to bring his medication. *Id.*

1    At the time of the interview on May 25, 2017, the Government had not yet sought
2  or obtained a search warrant for the iPhone 6 Plus.  On June 2, 2017, the Government
3  applied for and obtained a warrant to search the iPhone 6 Plus.  ECF No. 39-2.  On June
4  5, 2017, NCIS executed the warrant by using a program to extract the data from the
5  phone, which required the passcode.  ECF No. 107 at 15–17.

6  ## III.   DISCUSSION

7    Mr. Booker moves to suppress the passcode to the iPhone 6 Plus as well as all
8  statements and information seized from the iPhone 6 Plus, contending that his *Miranda*
9  rights as well as his rights under the Fourth, Fifth, and Sixth Amendments were violated.

10    The Government states that it has no intention to use Mr. Booker's act of
11  producing the passcode in its case-in-chief to prove the iPhone 6 Plus belonged to him.
12  ECF No. 73 at 4.  The Government further contends that (1) there was no action by the
13  agents that would amount to a search for the passcode under the Fourth Amendment, (2)
14  Mr. Booker's arguments fail because Mr. Booker was not compelled to provide his
15  passcode in violation of the Fifth Amendment or meriting suppression of the fruits of any
16  *Miranda* violation, and (3) his Sixth Amendment right to counsel had not yet attached.
17  The Government also argues that even if a constitutional violation occurred, the
18  information on the iPhone 6 Plus should not be suppressed because it inevitably would
19  have been discovered through lawful means.  *See* ECF No. 86.

20  ## A. WHETHER OBTAINING THE PASSCODE CONSTITUTED AN
21  ## UNLAWFUL SEARCH UNDER THE FOURTH AMENDMENT

22    Mr. Booker first contends that SA Warpinski's surreptitious viewing and copying
23  of the iPhone 6 Plus passcode constituted an unconstitutional search under the Fourth
24  Amendment.  ECF No. 71-1 at 5–7.  The Government disagrees that any action by the
25  agents amounted to a search because Mr. Booker placed the passcode in plain view of SA
26  Warpinski.  ECF No. 73 at 5.  Even if a Fourth Amendment violation did occur, the
27  Government argues, the doctrine of inevitable discovery applies such that the contents of
28  the iPhone 6 Plus should be admitted regardless.  ECF No. 86.

### 1. Fourth Amendment search

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV. A search occurs for Fourth Amendment purposes not only upon physical trespass to person or property, but "when government officers violate a person's 'reasonable expectation of privacy.'" *United States v. Jones*, 565 U.S. 400, 406 (2012) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967) (Harlan, J., concurring)).

As a starting point, the Parties dispute the applicability of *Arizona v. Hicks*, 480 U.S. 321 (1987) to the case at bar.  In *Hicks*, police officers entered the defendant's apartment without a warrant after a bullet had been fired through the floor.  *Id.* at 323. While searching for the shooter, victims, and weapons, officers noticed expensive stereo equipment and, suspecting they had been stolen, recorded the serial numbers, moving some of the components to do so.  *Id.*  The Supreme Court determined that although the officers were justified in entering the apartment based on exigent circumstances, as conceded by the defendant, an officer's moving of the equipment to obtain the serial number constituted a separate search.  *Id.* at 324–25.  While "[m]erely inspecting those parts of the turntable that came into view during the [original] search would not have constituted an independent search, because it would have produced no additional invasion of [the defendant's] privacy interest[,] . . . taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy." *Id.* at 325.

Here, as in *Hicks*, the agents infringed upon Mr. Booker's reasonable expectation of privacy.  There can be no question that a passcode entered into a cell phone, which is designed to keep the contents of the phone hidden from others, is generally considered by society to be something private that should be free from warrantless intrusion by the government.  *See Oliver v. United States*, 466 U.S. 170, 177–78 (1984); *cf. Riley v. California*, 573 U.S. 373, 393–98 (2014) (detailing the weighty privacy interests persons

have in the contents of their cell phones).  Mr. Booker also demonstrated an expectation of privacy in his passcode, given that he attempted to shield the passcode from the agents' view before being ordered to place the phone on the table.  *See Katz*, 389 U.S. at 361 (Harlan, J., concurring).

The Government attempts to distinguish *Hicks* and another case cited by Mr. Booker, *In the Matter of the Search of a Residence in Oakland, California*, 354 F. Supp. 3d 1010 (N.D. Cal. 2019) ("*Oakland*"), from the present case on the grounds that there was no search warrant involved here.  ECF No. 73 at 5.  First, *Hicks* did not involve a search warrant but, instead, an initially proper preliminary search justified by exigent circumstances.  *See Hicks*, 480 U.S. at 323.  The salient question raised in *Hicks* was whether officers had intruded on a reasonable expectation of privacy that could not be justified by the exigent circumstances underlying the original search.  *Id.* at 325. Meanwhile, in *Oakland*, the court did not explicitly analyze whether requiring people to turn over the biometric keys to their devices would constitute a search under the Fourth Amendment, only whether probable cause could support issuance of the warrant. *Oakland*, 354 F.Supp.3d at 1014.  Because the government in that case was applying for a search warrant, the definition of what qualifies as a "search" was not at issue.  The court's conclusion that the government lacked probable cause to compel the biometric keys of any person on the premises of the search location is therefore of limited assistance in resolving whether the agents' specific actions in the instant case amounted to a search within the meaning of the Fourth Amendment.

Had Mr. Booker voluntarily placed his passcode in plain view or consented to the agents' viewing of the passcode, the agents would not have made an intrusion onto any reasonable expectation of privacy related to the passcode.  A defendant has no reasonable expectation of privacy in items that are in plain view.  *See United States v. Wheeler*, 641 F.2d 1321, 1324 (9th Cir. 1981) (finding that the officer's "observations were lawful because they were of objects in plain view from places where [he] had a right to be under

the circumstances"). A defendant also cannot later object to a search if he gave consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

In this case, there is no question that SA Warpinski did not physically move the iPhone 6 Plus to view the passcode, which would be analogous to the situation in *Hicks*, where an officer moved a stereo receiver to access the serial number of the receiver. *Hicks*, 480 U.S. at 325. So the question boils down to whether Mr. Booker voluntarily permitted SA Warpinski to view the screen while he inputted his passcode. Mr. Booker ultimately entered the passcode within view of SA Warpinski; the agent did not sneak up behind Mr. Booker to obtain the passcode. However, it is also clear that Mr. Booker denied the agents consent to look at the contents of his iPhone and sought to protect against a plain view observation by initially holding it out of view of the agents. SA Warpinski ordered Mr. Booker to place his phone on the table, stating "You gotta keep it on the table, man I gotta be able to see what's going on," within a second or two of handing Mr. Booker the phone. ECF No. 54-1 at 40. As a result, Mr. Booker could only obtain his anxiety medication by entering the password in plain sight. SA Warpinski essentially conditioned Mr. Booker's call and access to medicine on disclosing his password. Ultimately, SA Warpinski's directive was the equivalent of requiring the defendant in *Hicks* to move the stereo equipment for the officer so that the officer could view the serial number.

When SA Warpinski made clear that Mr. Booker did not have the option to refuse to place his phone on the table and thus reveal his passcode, he led Mr. Booker to believe that he had no choice but to "consent" to obtain his medication. *See Schneckloth*, 412 U.S. at 223 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (prosecution must show consent was voluntarily given)). The totality of the circumstances—that Mr. Booker had remained in a custodial interrogation for over an hour at that point, had asked for his anxiety medication multiple times, had previously refused to consent to a search of his phone, and had been told that he was required to put the phone on the table where the agents could see it—indicate that Mr. Booker's revealing of the passcode was not

1  voluntary.  *See United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988) (quoting

2  *United States v. Alfonso*, 759 F.2d 728, 740 (9th Cir. 1985)).

3      Accordingly, the Court finds that the obtaining of Mr. Booker's passcode

4  constituted an unlawful warrantless search under the Fourth Amendment.

5          **2.  Inevitable discovery doctrine**

6      Derivative evidence obtained as a result of an unlawful search are typically

7  suppressible as "fruit of the poisonous tree."  *Nardone v. United States*, 308 U.S. 338,

8  341 (1939); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  The Government

9  argues that even if Mr. Booker makes out a Fourth Amendment violation, the inevitable

10  discovery doctrine permits admission of the contents of the iPhone 6 Plus because the

11  Government could have accessed the phone without using Mr. Booker's passcode.  ECF

12  No. 86.  Mr. Booker contends that the Government has failed to meet its burden to show

13  discovery was inevitable, as the prospect that NCIS could have unlocked the phone

14  without a passcode was speculative.  ECF No. 100.

15      "[T]he inevitable discovery doctrine allows for the admission of evidence that

16  would have been discovered even without the unconstitutional source."  *Utah v. Strieff*,

17  136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)).

18  For the inevitable discovery exception to apply, the prosecution must "establish by a

19  preponderance of the evidence that the information ultimately or inevitably would have

20  been discovered by lawful means."  *Nix*, 467 U.S. at 444.  "[I]nevitable discovery

21  involves no speculative elements but focuses on demonstrated historical facts capable of

22  ready verification or impeachment."  *Id.* at 444 n.5.

23      After agents obtained Mr. Booker's passcode, the Government applied for a search

24  warrant of the iPhone 6 Plus on June 2, 2017.  ECF No. 39-3.  The affidavit in support of

25  the application for the search warrant stated that "[t]he personnel conducting the

26  identification and extraction of data will complete the analysis within ninety (90) days of

27  the date the warrant is signed."  *Id.* ¶ 33.  The warrant was issued June 2, 2017.  ECF No.

28  39-2.  On June 5, 2017, NCIS executed the search by using a program from Cellebrite to

extract the data from the phone, a process that required NCIS to unlock the phone with the passcode.  ECF No. 107 at 15–17.  At that point, NCIS was only able to access a portion of the data on the phone.  *Id.* at 22.  The rest of the data was accessed on August 24, 2017, also using the passcode.  *Id.* at 24, 58–59.

In determining whether the Government would have inevitably obtained the information on the phone in the absence of the constitutional violation, the critical question is whether it was possible, from a technological standpoint, for the Government to unlock Mr. Booker's iPhone 6 Plus without the passcode.  The Government uses proprietary forensic tools from the private company Cellebrite to "unlock" cell phones without having the passcode, but whether Cellebrite is able to unlock a phone depends on whether it has the technology to unlock that specific cell phone model running a particular operating system.  The Government's position regarding when Cellebrite had the forensic tools to unlock Mr. Booker's phone—an iPhone 6 Plus Model A1522 running iOS 10.3.1—has changed since this issue was initially briefed.  At first, the Government asserted that Cellebrite had this technology on May 25, 2017 and that "Special Agent Warpinski knew NCIS had the available forensic tools to unlock an iPhone, and he believed he had no need to obtain the passcode from the Defendant." ECF No. 86 at 3; ECF No. 73-1 at 4–7 (Declaration of Joseph Warpinski) ¶ 6.  The Government submitted the declaration of an NCIS computer specialist, Heather Hatcher, who stated that "[a]ccording to Cellebrite," Cellebrite Advanced Services had the capability to unlock an iPhone 6 Plus Model A1522 running iOS 10.3.1 in May 2017. ECF No. 87 (Declaration of Heather Hatcher) ¶ 4.  Several months later, the Government submitted an amended declaration from Ms. Hatcher, which explained that in August 2019 Ms. Hatcher had "coordinated with the technicians at Cellebrite to determine when Cellebrite Advance Services (CAS) had the capability to unlock" that model of phone with that version of the operating system, and that she was told the capability was available in May 2017.  ECF No. 101-1 (Amended Declaration of Heather Hatcher) ¶ 4. Ms. Hatcher stated that "[s]ubsequently, Cellebrite contacted me to correct their earlier

information and explained that it was July 2017 when [CAS] had the capability to unlock an iPhone 6 Plus Model A1522 with operating system iOS 10.3.1." *Id.* ¶ 5.

Mr. Booker counters that Cellebrite did not have a surefire way to unlock Mr. Booker's phone, such that it was far from inevitable that the Government would discover the phone's contents. ECF No. 100 at 2. Mr. Booker has submitted the declaration of Josiah Roloff, who is the president and senior digital forensics examiner at a private digital forensics firm and who states that he has years of experience examining digital evidence, including smart phones. ECF No. 100-1 (Declaration of Josiah Roloff) ¶ 1. Mr. Roloff states that in his work, he has encountered hundreds of attempts to unlock Apple devices using Cellebrite's Advanced Services and other tools, and "[i]n numerous cases . . . observed such attempts to be unsuccessful" even after months of trying. ECF No. 109-1 (Supplemental Declaration of Josiah Roloff) ¶ 3. He further states that "there are many variables that affect a tool's chances at success in these processes." *Id.* ¶ 4. Mr. Booker also contends that the prospect of discovering the contents of the cell phone without the passcode is even more speculative given that NCIS would have had to apply for funds to send the phone to Cellebrite for the Advanced Services.

The changing landscape of the Government's declarants' assertions regarding when Cellebrite had the tools to unlock the iPhone 6 Plus with iOS 10.3.1 requires close inspection of the Government's current position that they would have inevitably unlocked the device in July 2017. Similarly, the fact that Ms. Hatcher's declarations relied on inconsistent statements from Cellebrite employees,[1] which provide no details about the forensic tools such as their success rate, makes it difficult for the Court to evaluate whether gaining access to the phone was inevitable, likely, or just a possibility in July 2017. While Mr. Roloff's declaration also does not provide specific data about the

---

[1] At the hearing, Ms. Hatcher stated that she had received the initial answer in response to an email from Cellebrite Support, and the second answer through the Cellebrite Portal from a technician on the Cellebrite Advanced Services team named Ron Villanueva, and that she was not aware of the exact positions of the people who responded to her questions. ECF No. 108 at 8, 26, 29.

success rate of the forensic tools the Government claims Cellebrite had available in this case, it is the Government's burden to demonstrate that discovery was inevitable by a preponderance of the evidence. *Cf. United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015) (finding that government failed to demonstrate inevitable discovery of information on defendant's phone by a preponderance of the evidence where it relied upon witness's testimony that was supported largely by hearsay, was vague, was unsupported by documentary evidence, and conflicted with the Government's position in a different case).

To find that discovery of the passcode would have been inevitable, the Court would have to make the following unwarranted assumptions: that even though the technology indisputably was not available at the time the Government obtained the search warrant on June 5, 2017, the Government would have sent the phone to Cellebrite in June 2017 with the hopes that suitable forensic tools would eventually become available; that the technology Cellebrite developed later in the summer of 2017 was sufficiently reliable to ensure the phone could be unlocked within the 90-day time period provided in the search warrant; and that the information on the phone would not be compromised through attempts to unlock it. While there is some likelihood that the Government would have ultimately unlocked the iPhone 6 Plus and accessed the information from the phone without having obtained Mr. Booker's passcode, there is also a non-negligible possibility that they would not have. Contrary to the mandate of *Nix*, if the evidence is not suppressed, the Government may well be placed in a better situation than had the constitutional violation not occurred. *Nix*, 467 U.S. at 443–44.

The Court thus concludes that the Government has failed to meet its burden of showing that discovery of the information on the iPhone 6 Plus was inevitable by a preponderance of the evidence, and the information on the phone must be suppressed as the fruit of the unconstitutional search.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## B. WHETHER THE PASSCODE WAS COMPELLED TESTIMONY IN VIOLATION OF THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION

Mr. Booker asserts that the agents compelled Mr. Booker to provide the passcode in violation of the Fifth Amendment privilege against self-incrimination when SA Warpinski required him to place the iPhone 6 Plus on the table before calling to obtain his anxiety medication.  ECF No. 71-1 at 9.  The Government disputes that Mr. Booker was compelled to provide the passcode, and that he instead voluntarily entered the passcode within the eyesight of SA Warpinski.  ECF No. 73 at 3–4.

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself." *United States v. Hubbell*, 530 U.S. 27, 34 (2000). "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004).  Here, the Government does not appear to dispute that the passcode was potentially self-incriminating and may be considered testimonial, so the main question is whether the agents compelled Mr. Booker to reveal the passcode.  ECF No. 73 at 3.[2]

---

[2] Though seemingly conceding that a password may be testimonial, Government does suggest that there is no Fifth Amendment concern because the existence, custody, and authenticity of the iPhone 6 Plus was a "foregone conclusion."  ECF No. 73 at 3 (quoting *Fisher v. United States*, 425 U.S. 391, 410 (1976)).  But the discussion in *Fisher* of these elements related to whether there were any "communicative aspects" to responding to a summons or subpoena for taxpayer records, such that a summons or subpoena could be viewed as having compelled a testimonial *communication* in violation of the taxpayers' rights.  *Fisher*, 425 U.S. at 408–407.  The Court was "confident that however incriminating the contents of the accountant's workpapers might be, the act of producing them[,] the only thing which the taxpayer is compelled to do[,] would not itself involve testimonial self-incrimination." *Id.* at 410–11.  But here, Mr. Booker argues that he was compelled to input—essentially write out—his passcode for the agents.  This situation is far closer to "telling an inquisitor the combination to a wall safe," which the Supreme Court has suggested in *dicta* would be testimonial. *Hubbell*, 530 U.S. at 43; *see also Matter of Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1015 (N.D. Cal. 2019) (collecting cases finding that communicating a password is testimonial).

14

1    To determine whether the defendant was compelled, courts consider if the
2    admission was not "free and voluntary; that is, . . . extracted by any sort of threats or
3    violence, [or] obtained by any direct or implied promises, however slight, [or] by the
4    exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (quoting
5    *Bram v. United States*, 168 U.S. 532, 542–43 (1897)); *Miranda v. Arizona*, 384 U.S. 436,
6    476 (1966) ("[A]ny evidence that the accused was threatened, tricked, or cajoled into a
7    waiver will, of course, show that the defendant did not voluntarily waive his [Fifth
8    Amendment] privilege."); *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citation
9    omitted) ("[T]he relinquishment of the right must have been voluntary in the sense that it
10   was the product of a free and deliberate choice rather than intimidation, coercion, or
11   deception."). Courts must apply a totality of the circumstances test to determine whether
12   a defendant's statement was involuntary. *Beaty v. Stewart*, 303 F.3d 975, 992 (9th Cir.
13   2002).

14       Here, the totality of the circumstances indicates that Mr. Booker did not voluntarily
15   show his passcode to SA Warpinski. Based on review of the video, the Government's
16   argument—that SA Warpinski believed Mr. Booker had already unlocked the phone and
17   that he did not anticipate Mr. Booker would enter his passcode within his eyesight—is
18   unconvincing. SA Warpinski almost immediately instructed Mr. Booker to put the phone
19   where he could see it, and did not qualify his instruction to suggest that Mr. Booker was
20   permitted to enter his passcode out of sight of the agents. The fact that SA Warpinski
21   was ready to record the passcode bolsters the Court's conclusion that SA Warpinski was
22   aware that his instruction to put the phone on the table would likely require Mr. Booker
23   to input the passcode in front of the agents.

24       Once SA Warpinski told Mr. Booker that he needed to place the iPhone 6 Plus
25   where the agents could see it, Mr. Booker had two choices: enter the passcode within the
26   agents' line of sight, or not access his medication. Arguably, Mr. Booker could have
27   disobeyed SA Warpinski's order and entered the passcode out of sight, or requested
28   permission to do so. However, SA Warpinski's instruction was unequivocal: "You gotta

keep it on the table, man I gotta be able to see what's going on." ECF No. 54-1 at 40. Especially in light of the fact that Mr. Booker had been raising his need to take his anxiety medication for nearly the past hour of custodial interrogation, *see* ECF No. 54-1 at 10, 39, it is unreasonable to expect Mr. Booker to have refused to follow SA Warpinski's instructions. Mr. Booker's previous statements in which he steadfastly refused to permit agents to search his phone also support a finding that Mr. Booker did not suddenly decide to voluntarily turn over the passcode to the agents. *Cf. United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993) (citation omitted) (noting that a confession is voluntary if it is the "product of the suspect's own balancing of competing considerations"). While Mr. Booker conceivably could have been more vigilant about guarding his rights by refusing to enter the passcode, at this point in the nearly three-hour interview, his focus was understandably on getting his medication. It appears that the agents took advantage of this fact to force Mr. Booker into entering the password in front of them. Taking into account the totality of the circumstances, the Court therefore concludes that the passcode was compelled in violation of the Fifth Amendment.

The fruits of a statement compelled in violation of the Fifth Amendment privilege may not be admitted against a defendant. *See United States v. Patane*, 542 U.S. 630, 640 (2004) (plurality opinion); *United States v. Mandujano*, 425 U.S. 564, 576 (1976). Accordingly, the Court **GRANTS** the motion to suppress the iPhone 6 Plus passcode and the information seized as a result of the compelled passcode.

## C. WHETHER THE PASSCODE WAS OBTAINED IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL

Mr. Booker also contends that the passcode was a statement taken in violation of his Sixth Amendment right to counsel. Once the right to counsel attaches and is invoked, the Sixth Amendment bars the government from questioning the accused outside the presence of counsel. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). However, the right to counsel under the Sixth Amendment "does not attach until a prosecution is commenced," meaning "at or after the initiation of adversary judicial criminal proceedings—whether by

3:18-cr-02611-GPC

way of formal charge, preliminary hearing, indictment, information, or arraignment."
*United States v. Charley*, 396 F.3d 1074, 1082 (9th Cir. 2005) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).

Here, Mr. Booker was charged on May 23, 2018, when the grand jury returned the indictment.  ECF No. 15.  Criminal proceedings had therefore not yet commenced against Mr. Booker on May 27, 2017, when the NCIS agent obtained his passcode.  Accordingly, the Sixth Amendment right to counsel had not yet attached.

The Court therefore concludes that the passcode was not obtained in violation of the Sixth Amendment.

## D. WHETHER THE PASSCODE WAS OBTAINED IN VIOLATION OF *MIRANDA*

While the parties have previously briefed whether a *Miranda* or *Edwards* violation occurred during the May 25, 2017 interview, the Court did not resolve the issue in light of the Government's agreement not to offer certain statements in its case in chief.  ECF No. 79 at 15–16.  Accordingly, the Court must now determine whether the passcode was obtained in violation of *Miranda* or *Edwards* and whether the fruits of any such violation must be suppressed.  *See Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981).

### 1.  Custody

The protections of *Miranda* and *Edwards* only apply if a defendant is in custody. *Miranda*, 384 U.S. at 478–79; *Edwards*, 451 U.S. at 486.  As the Court found in its order on Mr. Booker's previous motion to suppress, *see* ECF No. 79 at 16, the May 25, 2017 interview was custodial.

### 2.  Reinitiation of communication

During the May 25, 2017 interview, Mr. Booker invoked his right to counsel and requested to stop the interview at multiple points in time.  At the beginning of the interview when SA Warpinski asked if Mr. Booker would like to give a statement, he responded "No, I would rather have a lawyer."  ECF No. 54-1 at 6.  This was an

17

3:18-cr-02611-GPC

1   unequivocal invocation of his right to an attorney that would be understood by a

2   reasonable officer.[3]  *See Davis v. United States*, 512 U.S. 452, 459 (1994).  Thus, at the

3   time he entered the passcode, Mr. Booker had invoked his right to counsel.

4          However, after Mr. Booker's initial invocation of the right to counsel, the agents

5   continued to engage Mr. Booker in a conversation, initially about the search warrant.

6   The Supreme Court in *Edwards* held that *Miranda* requires that a suspect who has

7   invoked his or her right to counsel not be subject to further interrogation until counsel has

8   been made available, unless the suspect him or herself initiates the communication.  451

9   U.S. at 484–85.  "[I]f the accused invoked his right to counsel, courts may admit his

10  responses to further questioning only upon finding that he (a) initiated further discussions

11  with the police and (b) knowingly and intelligently waived the right he had invoked."

12  *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (*citing Edwards*, 451 U.S. at 485–

13  86, n.9).  The question is therefore whether Mr. Booker had initiated further

14  communication with the agents and knowingly and intelligently waived his right to

15  counsel at the time he revealed his passcode.

16         The Court concludes that the agents, not Mr. Booker, reinitiated the interrogation

17  following Mr. Booker's clear invocation of his right to counsel at the May 25, 2017

18  interview.  An officer's statement qualifies as interrogatory under *Miranda* if it is

19  "reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S.

20  291, 301 (1980).  However, an accused is considered to initiate the conversation if their

21  statement indicates a "desire . . . to open up a more generalized discussion relating

22

23  _____

24  [3] Later in the interview, as the agents attempted to impress upon him the strength of their case, Mr.
    Booker also stated "That's why I was like no, I need a lawyer because I don't know what the fucks
25  going on."  ECF No. 54-1 at 33.  This was also a clear statement reaffirming that Mr. Booker intended to
    invoke his right to counsel.  *See also* ECF No. 54-1 at 28 ("That's why I wanted a lawyer in the first
26  place."); 34 ("Dude I completely get it, I really do, but that's another reason why, just what you said, I
    wanted a lawyer in the first place.").  Immediately before the events that led to SA Warpinski obtaining
27  Mr. Booker's passcode, Mr. Booker also stated "At this point, it's like now I am getting frustrated, now
    I know I need my medication and I don't, I don't want to do this anymore man."  ECF No. 54-1 at 39.
28  This was another signal for the agents to end the interview, but they did not.

directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).

Although the agents began to engage Mr. Booker in conversation about the search warrant after he invoked his right to counsel, they quickly turned the discussion back to the investigation more generally.  When the agents explained the search warrants, suggesting that it was a joint terrorism investigation with the FBI, Mr. Booker mentioned that he thought the agents were engaging in a "good cop, bad cop" routine and then stated that he wanted to be there when they executed the warrants.  ECF No. 54-1 at 7.  This statement was in response to the agents' explanation of the search warrants, not an unprompted invitation to discuss the investigation more generally.   But the agents took the opportunity to emphasize to Mr. Booker not only that the "good cop/bad cop thing is not a real thing," but also that "the evidence speaks for itself" and "[t]oday was an opportunity for you just to talk and tell us your story" so that they "could go back and do good work, write good reports, talk to the right people and tell them exactly what you told us." *Id.* at 8.  These statements were reasonably likely to prompt an incriminating response because they suggested to Mr. Booker that he was forfeiting his chance to attempt to explain the alleged mountain of evidence the agents had against him, which they had described in detail prior to the Article 31(b) warnings.  *Cf. Martinez v. Cate*, 903 F.3d 982 (9th Cir. 2018) (finding that statement including "all I wanted was your side of the story," coupled with suggestion that making a statement would prevent suspect from being booked for murder, to be interrogatory); *Smith v. Endell*, 860 F.2d 1528, 1533 (9th Cir. 1988) ("The repeated recitations of the circumstances tying Smith to the murders . . . was a powerful—though subtle—inducement for him to confess.").  Thereafter, SA Bell recognized that Mr. Booker had invoked his right to counsel but improperly revisited the issue, stating that "you made the decision today that you don't want to talk.  It sounds like you have got stuff to talk about to me.  Wouldn't you say so?"  ECF No. 54-1 at 9.  The purpose of *Edwards* is to prevent agents from "badger[ing]" or "wear[ing] down" a suspect to persuade them to make a statement despite an earlier request for counsel,

*Smith*, 469 U.S. at 98, but the agents did just that here.  While the agents opened their post-invocation discussion by raising "safety questions", ECF No. 54-1 at 7, they ultimately made several statements likely to elicit an incriminating response regarding the broader investigation and thus improperly reinitiated the interrogation.

Accordingly, as Mr. Booker unequivocally invoked his right to counsel and the agents continued the interrogation in violation of *Miranda* and *Edwards*, eventually leading Mr. Booker to reveal his passcode, the Court concludes the passcode was obtained in violation of *Miranda*.

### 1. Fruit of the poisonous tree

Although the Court finds that the passcode itself was obtained in violation of *Miranda* and is thus inadmissible in the Government's case-in-chief, the question remains whether the fruits of the *Miranda* violation—namely, the information found on the iPhone 6 Plus that was obtained using the passcode—are also inadmissible.  With respect to this issue, the parties primarily dispute the import of the rule announced in *United States v. Patane*, which held that the physical fruits of an uncoerced statement obtained in violation of *Miranda* need not be suppressed.  542 U.S. 630, 634 (2004) (plurality opinion).

In *Patane*, the plurality rejected a blanket suppression of the fruits of *Miranda* violations, reasoning that any extension of *Miranda* protections beyond exclusion of the unwarned statement itself "must be justified by its necessity for the protection of the actual right against compelled self-incrimination." *Id.* at 639–40.  The plurality explained that such a rule could not be supported "by reference to the Fifth Amendment goal of assuring trustworthy evidence or by any deterrence rationale," as the *Miranda* rule does not operate as a constraint on police interrogation practices but rather the admissibility of statements.  *Id.* at 640–42 & n.3 (internal quotation marks omitted).  As a result, the Court found that although Patane's statement identifying the location of a firearm had been made absent adequate *Miranda* warnings, the firearm itself need not be suppressed at trial from the prosecution's case-in-chief.  *Id.* at 635–37.  Justice Kennedy,

1  joined by Justice O'Connor, concurred on narrower grounds, finding that admitting

2  nontestimonial physical fruits of an unwarned statement did "not run the risk of admitting

3  into trial an accused's coerced incriminating statements against himself," but declined to

4  join the plurality's characterization of the *Miranda* rule as unrelated to any deterrence

5  rationale.  *Id.* at 645 (Kennedy, J., concurring).  The Ninth Circuit recently held that

6  Justice Kennedy' narrower opinion controls.  *See Tekoh v. City of Los Angeles*, 985 F.3d

7  713, 721–22 (9th Cir. Jan. 15, 2021).

8          As the cases cited by the parties demonstrate, district courts, in similar contexts to

9  those here, have come to different conclusions regarding whether *Patane* permits

10  admission of the fruits of a cell phone passcode obtained in violation of *Miranda*.  In

11  *United States v. Hernandez*, the court applied *Patane* and a previous Ninth Circuit case,

12  *United States v. Gonzalez-Sandoval*, 894 F.2d 1043i0-[i0, 1048 (9th Cir. 1990), and

13  determined that the contents of a cell phone need not be suppressed as fruits of a *Miranda*

14  violation unless the passcode was obtained involuntarily.  *United States v. Hernandez*,

15  No. 18-CR-1888-L, 2018 WL 3862017, at *4 (S.D. Cal. Aug. 13, 2018).  But in *United*

16  *States v. Djibo*, a case in which Department of Homeland Security agents obtained the

17  defendant's phone passcode during a border search before giving him *Miranda* warnings,

18  the district court distinguished *Patane* for several reasons.  *Djibo*, 151 F. Supp. at 297.

19  The court first noted that the search of Djibo's device also implicated the Fourth

20  Amendment protection from unreasonable searches, to which the fruit of the poisonous

21  tree doctrine clearly applies.  *Id.* at 309.  The court also explained that the deterrence

22  rationale the plurality had found lacking in *Patane* was present in Djibo's case, opining

23  that the agent who obtained the passcode during the unwarned interview had sought to

24  expand the border search past constitutional limits by asking for the passcode before

25  providing *Miranda* warnings.  *Id.* at 309–10.  Lastly, the court emphasized that unlike the

26  firearm in *Patane*, the fruits of the unwarned statement in Djibo's case was a cell phone

27  containing a wealth of information about the defendant and thus is of a different character

28

21

than most physical evidence, as the Supreme Court explained in *Riley v. California*, 573 U.S. 373 (2014).  *Id.* at 310.

However, the Court need not reach this complicated question if Mr. Booker's revealing of his passcode was involuntary or coerced.  "Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, the primary criterion of admissibility [remains] the 'old' due process voluntariness test." *Elstad*, 470 U.S. at 307–08 (citation omitted).  In *Patane* and several previous cases, the Supreme Court has indicated that the admissibility of the fruits of a *Miranda* violation likewise turns on the voluntariness of the unwarned statement.  *See Patane*, 542 U.S. at 644; *Michigan v. Tucker*, 417 U.S. 433, 448 (1974) (finding concerns about trustworthiness not applicable where defendant's unwarned statement was not coerced and did not implicate himself); *Oregon v. Elstad*, 470 U.S. 298, 309 (1985) ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

"[S]tatements are not presumed to be involuntary by virtue of the *Edwards* violation alone."  *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019).  The due process voluntariness inquiry largely overlaps with the analysis of whether a confession was compelled in violation of the Fifth Amendment privilege against self-incrimination.  *See Missouri v. Seibert*, 542 U.S. 600, 607 (2004).  As under the self-incrimination clause, for due process purposes the Court assesses the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'"  *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).  In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements."  *Elstad*, 470 U.S. at 318.

For the same reasons that the Court concludes that Mr. Booker was compelled to provide the passcode in violation of his Fifth Amendment privilege, the statement taken in violation of *Miranda* and *Edwards* was not knowingly and voluntarily made.  Mr. Booker's revealing of the passcode was not a product of a reasoned decision to provide it to the agents, nor was it the result of carelessness.  Instead, Mr. Booker entered the passcode within view of the agents because SA Warpinski directed him that he needed to place the iPhone 6 Plus on the table while he used it to contact his command to send over his anxiety medication.  In these circumstances, Mr. Booker did not turn over the passcode voluntarily.

The Court therefore **GRANTS** the motion to suppress the information on the phone as fruits of an involuntary statement taken in violation of *Miranda*.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS** Mr. Booker's motion to suppress the passcode and information obtained from the iPhone 6 Plus.

**IT IS SO ORDERED**.

Dated:  September 17, 2021

Hon. Gonzalo P. Curiel
United States District Judge